IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JACQUELYN RAINES,　　　　　　　*
　　　　　　　　　　　　　　　　*
　　　　　　　Plaintiff,　　　　　*
　　　　　　　　　　　　　　　　* ·
　　　　　vs.　　　　　　　　　　*　　　Civil Action No.　ADC-19-1266
　　　　　　　　　　　　　　　　*
AMERICAN FEDERATION OF　　　　*
TEACHERS – MARYLAND　　　　　 *
PROFESSIONAL EMPLOYEES COUNCIL, *
AFL-CIO LOCAL 6197, *et al.*,　　　*
　　　　　　　　　　　　　　　　*
　　　　　　　Defendant.　　　　　*
　　　　　　　　　　　　　　　　*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Defendants, American Federation of Teachers – Maryland Professional Employees Council, AFL-CIO Local 6197 ("MPEC"), Jerry Smith, Andrea Buie-Branam, Ronny Myers, Simeon Williams, and Cedric Brown, move this Court to dismiss the First Amended Complaint of Plaintiff, Jacquelyn Raines, for racial discrimination and retaliation brought pursuant to 42 U.S.C. § 1981, gender discrimination and retaliation brought pursuant to the Maryland Equal Pay Act ("MEPA"), MD. CODE, LAB. & EMPL. §§ 3-301–309, and wrongful termination (the "Motion to Dismiss") (ECF No. 22).[1] After considering the Motion to Dismiss and the responses thereto (ECF Nos. 23, 24), the Court finds that no hearing is necessary. *See* Loc.R. 105.6 (D.Md. 2018). For the reasons stated herein, the Court GRANTS in part and DENIES in part Defendants' Motion to Dismiss.

---

[1] The First Amended Complaint also contained a claim for civil conspiracy to commit tort and civil rights violations. ECF No. 20 at 44, ¶¶ 251–58. Plaintiff has voluntarily dismissed this claim, ECF No. 23 at 27–28, and Defendants have consented to this dismissal, ECF No. 24 at 1 n.1. Accordingly, this Court need not address Defendants' motion as it relates to the conspiracy claim.

When reviewing a motion to dismiss, this Court accepts as true the facts alleged in the challenged complaint. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011). MPEC is a union covering professional state employees. ECF No. 20 at 3, ¶ 14; ECF No. 22-1 at 1. In December 2016, MPEC hired Plaintiff, an African-American woman, as a Field Coordinator and Labor Representative. ECF No. 20 at 3, ¶ 14. Plaintiff's Field Coordinator contract was effective from December 5, 2016, through December 4, 2018, and she received an annual salary for that position of $75,000. *Id.* at 5, 12, ¶¶ 24, 64.

When Plaintiff began her employment with MPEC Martin Guinane, a white male, was the Executive Director. *Id.* at 4, ¶ 15. While serving as MPEC's Executive Director, Mr. Guinane (like former MPEC Executive Directors) also performed tasks as the Executive Director of AFT-Healthcare Maryland ("AFT"), another union. *Id.* at 7–8, ¶¶ 37, 39–40. Most of Mr. Guinane's tasks were in his capacity as Executive Director of MPEC, and many of his duties for AFT overlapped with his responsibilities for MPEC and could be performed simultaneously. *Id.* at 7–9, ¶¶ 37–47. MPEC and AFT also shared the same office space and materials, and MPEC paid both unions' bills while they shared an Executive Director, with occasional forty percent reimbursement from AFT. *Id.* at 9, ¶ 44. Prior to his December 2017 resignation, Mr. Guinane received an annual salary of $120,000, with MPEC contributing $72,000 and AFT contributing $48,000. *Id.* at 5, 12, ¶¶ 25, 62–64. Mr. Guinane never performed tasks beyond those traditionally attributed to an Executive Director. *Id.* at 9–10, ¶¶ 47, 51–52. While it is unclear when MPEC and AFT "severed ties," they continued to occupy the same office space, and the two unions

decided to implement separate Executive Director positions in or about February 2018. *Id.* at 11–12, ¶¶ 55–66, 61.

On April 1, 2018, the President of MPEC's board, Jerry Smith, told Plaintiff that he wanted her to fill the role of MPEC's Interim Executive Director and eventually be the permanent Executive Director. *Id.* at 11, ¶ 55, 57. Plaintiff's contract for the Interim Executive Director position was effective from April 6, 2018, through July 31, 2018; by its terms, the contract automatically extended beyond July 31, 2018, if Plaintiff continued in MPEC's employment. *Id.* at 6, ¶¶ 27–29.

At the April 1 meeting, Defendant Smith offered her a $75,000 salary for the Interim Executive Director position. *Id.* at 11, ¶ 57. This was the same salary to which she was already entitled as a Field Coordinator, *id.*, and Plaintiff was still performing her original Field Coordinator duties in addition to a variety of new tasks as Interim Executive Director. *Id.* at 10, ¶ 50. After consideration, on April 2, 2018, Plaintiff accepted the Interim Executive Director position via email, but rejected the proposed salary because it was much less than the $120,000 Mr. Guinane received. *Id.* at 11–12, ¶¶ 57–62. Defendant Smith responded via email that MPEC only contributed $72,000 to Mr. Guinane's salary, but Plaintiff responded that she had seen MPEC's 2017 budget, which indicated that Mr. Guinane would continue to receive $120,000 from MPEC after AFT was no longer contributing to his salary. *Id.* at 12, ¶¶ 63–64. During this salary conversation, Defendant Smith justified Plaintiff's lower salary by stating that other members of the hiring committee for the Executive Director positions did not want her in the position. *Id.* at 13, ¶ 67. Defendant Smith told Plaintiff via email that the reason the other members of the

committee wanted to offer Plaintiff a lower salary was "[t]hey wanted the white man" in the Executive Director position. *Id.*

As Interim Executive Director, Plaintiff continued to perform her original Field Coordinator duties while also handling financial, employment, human resources, and administrative tasks. *Id.* at 10, ¶ 50. By all accounts, Plaintiff performed her duties satisfactorily, and was never accused of deficient job performance or improper workplace conduct. *Id.* at 7, 18, 29 ¶¶ 34, 95, 166. Although MPEC and AFT no longer officially employed the same Executive Director, Plaintiff had to perform business tasks for AFT on multiple occasions. *Id.* at 9, ¶ 46, 48. During the course of her duties, Plaintiff discovered that MPEC and AFT's funds were co-mingled and had been for years, as a result of previous Executive Directors serving both unions. *Id.* at 7, ¶¶ 36–37. Furthermore, in late October or early November 2018, Plaintiff discovered that AFT's 401(k) contributions and fees were withdrawn from MPEC's bank account. *Id.* at 10–11, ¶ 54. The co-mingling of the accounts occurred while Mr. Guinane was Executive Director, and Plaintiff reported the issue to the MPEC Board. *Id.* at 10–11, ¶¶ 53–54.

Disagreement regarding Plaintiff's salary for the Executive Director position continued through May 2018. *Id.* at 13–14, ¶¶ 67–72. Plaintiff continued to dispute the lower salary offers as racially and gender discriminatory. *Id.* at 13–14, ¶ 70. In May 2018, the MPEC Board tabled the salary discussion until they could reach a permanent agreement; while the discussion was tabled, the Board gave Plaintiff a stipend of $1,666.00 per month for the Interim Executive Director position. *Id.* at 14, ¶ 72. After the May 2018 meeting, Plaintiff spoke to two Board members Jewel Freeman-Scott and Ricky Carpenter about the decision to pay her a lower salary than Mr. Guinane, and both members responded that it was because she is "a black woman." *Id.* at 14, ¶¶ 73–74. On July 26, 2018, the MPEC Board approved a proposal that Plaintiff would continue to

4

receive the $75,000 Field Coordinator salary and the $1,666.00 per month stipend. *Id.* at 15, ¶¶ 75–76. At the same time, however, instead of installing Plaintiff as the permanent Executive Director, the Board voted to change her title from "Interim" to "Acting" Executive Director. *Id.* at 15, ¶ 77. When Plaintiff asked Ms. Freeman-Scott why she was given the "Acting" title, she responded, "I feel like they just don't want to see a black woman with that title." *Id.* at 15, ¶ 78.

On July 31, 2018, Plaintiff sent Defendant Smith an email titled "Gender & Race Discrimination." *Id.* at 15, ¶ 79. In the email, Plaintiff accused the Board of racial and gender bias and discrimination as it related to her title and compensation. *Id.* During the ensuing discussion, Plaintiff emphasized that she was being paid less than her white, male predecessor for the same tasks and that she had maintained from the beginning of the salary discussions that the Board's behavior regarding her title and compensation was discriminatory. *Id.* at 15–17, ¶¶ 79–84. Despite Plaintiff pressing the issue, at each of the September 20, 2018, October 18, 2018, and November 8, 2018 MPEC Board meetings, the Board decided to "table" discussions of Plaintiff's title and salary indefinitely, until Defendant Smith informed Plaintiff on November 9, 2018, that the Board would not discuss her contract until January 2019. *Id.* at 17–18, ¶¶ 89–93.

During the course of these salary conversations, Plaintiff was supervising other employees as Interim Executive Director. Felicia Hawkins, an employee paid jointly by AFT and MPEC through a partnership program, was assigned by an AFT project to be a union organizer for MPEC. *Id.* at 19, ¶¶ 97–98. At some point after Ms. Hawkins' hiring but before late June 2018, Ms. Hawkins and Defendant Smith had a sexual relationship. *Id.* at 19, ¶¶ 99–100. At the end of July 2018, Defendant Smith asked Plaintiff to put Ms. Hawkins on the permanent MPEC payroll after the partnership program with AFT ended. *Id.* at 19–20, ¶ 101. Plaintiff proposed a salary for Ms. Hawkins of $52,000, but Defendant Smith demanded that Ms. Hawkins receive $60,000, over

Plaintiff's strong objections. *Id.* at 20, ¶¶ 101–03. On September 25, 2018, Defendants Smith and Buie-Branam confronted Plaintiff and her staff about Ms. Hawkins, contending that Plaintiff had been tracking Ms. Hawkins when she was missing work. *Id.* at 20–21, ¶¶ 106–107. After Plaintiff questioned Defendants Smith and Buie-Branam about their interrogation methods, Defendant Smith threatened to fire Plaintiff. *Id.* at 21, ¶¶ 108–11. Despite Ms. Hawkins frequently missing work and her subpar job performance, Plaintiff, as instructed by Defendant Smith, issued Ms. Hawkins' new contract on September 29, 2018, which Ms. Hawkins rejected because she wanted to receive a variety of additional benefits beyond what other MPEC employees received. *Id.* at 20, 22 ¶ 104, 114–15. Plaintiff rejected Ms. Hawkins' demands. *Id.* at 22, ¶ 116. On November 9, 2018, Defendants Smith and Buie-Branam rewrote the MPEC standard union organizer contract to create a specific contract for Ms. Hawkins that paid her additional benefits over what other employees received and drastically lowered the performance metrics and standards Ms. Hawkins would need to "meet expectations" in her role. *Id.* at 24–25, ¶¶ 133–37.

Also on November 9, 2018, after Defendant Smith told Plaintiff the Board would not review her Interim Executive Director contract until January, Defendant Smith told Plaintiff at a staff meeting that Ms. Hawkins would continue to work on assignment in the same agency in which he worked, despite it being Plaintiff's job to make these assignments. *Id.* at 22–23, ¶¶ 119–23. After the staff meeting, Defendants Smith and Buie-Branam met with Plaintiff alone, during which they chastised her both for challenging Defendant's Smith's authority and for trying to continue to discuss her salary with the Board. *Id.* at 23, ¶¶ 125–27. Defendant Smith then made his second threat to terminate Plaintiff, emphasizing that he would not need the rest of the Board's permission to do so. *Id.* at 24, ¶ 130. On December 17, 2018, Defendant Buie-Branam sent Plaintiff a copy of the contract she and Defendant Smith had created for Ms. Hawkins. *Id.* at 24,

¶ 134. Because she felt that Ms. Hawkins' contract terms were not in the best interest of MPEC union members, Plaintiff sent the contract to MPEC's legal counsel on January 7, 2019, expressing that the contract was created from a conflict of interest, and it was legal counsel's responsibility to prepare employment contracts. *Id.* at 25, ¶¶ 137–38. On January 9, 2019, Defendants Smith and Buie-Branam again met with Plaintiff alone to ask why she had not signed Ms. Hawkins contract, and then to scold her for sending it to legal counsel for review. *Id.* at 27, ¶¶ 147–49. Plaintiff expressed that the changes to the contract were "a blatant conflict of interest when this organization is hurting for members and money," and Defendant Smith responded by trying to suspend Plaintiff, before being instructed to leave by another Board member over the phone. *Id.* at 27, ¶¶ 150–55.

On February 1, 2019, Defendant Smith and Mr. Carpenter gave Plaintiff a sixty-day notice of termination. *Id.* at 28, ¶ 159. Plaintiff's last day in MPEC's office was February 15, 2019, and her sixty-day notice period expired on April 1, 2019. *Id.* at 29, ¶ 163. MPEC's legal counsel confirmed that Plaintiff was not terminated for cause. *Id.* at 29, ¶ 165. After Plaintiff's termination from MPEC, Mr. Guinane resumed the role of Executive Director on a part-time, temporary basis of twenty hours per week for $7,500 per month (equating $90,000 annually). *Id.*

## PROCEDURAL BACKGROUND

On April 30, 2019, Plaintiff filed this lawsuit against Defendants, seeking declarations that Defendants failed to comply with relevant laws, an injunction instructing Defendants to comply with relevant laws, an award of unpaid wages and actual, liquidated, and punitive damages, and attorneys' fees and costs (ECF No. 1).[2] On July 1, 2019, Defendants filed a motion to dismiss for

---

[2] On April 30, 2019, in accordance with Standing Order 2018-04 of the United States District Court for the District of Maryland and upon consent of all parties, this case was directly assigned to United States Magistrate Judge A. David Copperthite for all proceedings. ECF No. 3.

failure to state a claim (ECF No. 16). Two days later, on July 3, 2019, Plaintiff filed a motion for leave to file a First Amended Complaint (ECF No. 17), which the Court granted on July 8, 2019 (ECF No. 18).[3]

On July 22, 2019, Plaintiff filed a First Amended Complaint (ECF No. 20). On August 5, 2019, Defendants filed a Motion to Dismiss the amended complaint for failure to state a claim (ECF No. 22). On August 13, 2019, Plaintiff opposed the Motion to Dismiss (ECF No. 23), and on August 27, 2019, Defendant filed a reply (ECF No. 24). Accordingly, the Motion to Dismiss is fully briefed.

## DISCUSSION

Defendants argue that Plaintiff's § 1981 claims for racial discrimination and retaliation, Maryland Equal Pay Act claims for gender discrimination and retaliation, and wrongful discharge claims fail to state a claim pursuant to Fed.R.Civ.P. 12(b)(6).[4] ECF No. 22 at 1.

### A. Standard of Review for Motion to Dismiss for Failure to State a Claim

The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."

---

[3] The Court also issued a paperless order on July 31, 2019, dismissing as moot Defendants' motion to dismiss Plaintiff's original complaint. ECF No. 20.

[4] Defendants also argue that if the Court dismisses the federal claims—Counts I and II—it must dismiss the remaining state law claims for lack of subject matter jurisdiction. ECF Nos. 22 & 22-1 at 14–15. Defendants mistake the extent of the Court's supplemental jurisdiction. This Court has supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a) (2018). If the Court dismisses claims over which it has original jurisdiction, it is within the Court's sole discretion whether it also dismisses the claims over which is has supplemental jurisdiction. 28 U.S.C. § 1367(c)(1) (2018) ("district courts *may decline* to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction" (emphasis added)). Accordingly, if the Court were to dismiss Counts I and II, it would not be automatically required to also dismiss the remaining Counts.

*King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* An inference of a mere possibility of misconduct is not sufficient to support a plausible claim. *Id.* at 679. As stated in *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. at 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (internal citations omitted). Although when considering a motion to dismiss a court must accept as true all factual allegations in the complaint, this principle does not apply to legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555.

## B. Defendants' Motion to Dismiss

In their Motion, Defendants seek to dismiss all claims against them. The Court will address each Count in turn.

### 1. § 1981 Racial Discrimination and Retaliation Claims (Counts I and II)

In Counts I and II, Plaintiff alleges that all Defendants[5] engaged in racial discrimination and retaliation against her in violation of 42 U.S.C. § 1981. Plaintiff alleges that Defendants discriminated against her by refusing to pay her a salary equal to her white, male predecessor and

---

[5] Plaintiff concedes that Defendants Myers and Williams were not involved in the decision to terminate her. ECF No. 23 at 14 n.5, 29. Accordingly, she dismisses Counts I and II as to Defendants Myers and Williams *only* to the extent that the claims relate to her termination. *Id.*

ultimately terminating her based on her race. Plaintiff then alleges that Defendants retaliated against her for protesting their discriminatory actions by refusing to address the issues of her salary and title and ultimately terminating her.

> a. Plaintiff alleges sufficient facts under both the direct/indirect evidence test and the *McDonnell Douglas* framework to sustain her § 1981 claim of racial discrimination.

§ 1981 provides, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (2018). Though Plaintiff does not bring her claims under Title VII, "[t]he same analysis applies to race discrimination and retaliation claims under both Title VII and Section 1981." *Tibbs v. Balt. City Police Dep't*, RDB-11-1335, 2012 WL 3655564, at *3 (D.Md. Aug. 23, 2012). Plaintiffs may prove discrimination through "two 'avenues of proof'": (1) direct or indirect evidence, or (2) the burden-shifting framework of *McDonnell Douglas*. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc)). "It is left to the plaintiff's discretion whether to proceed by direct and indirect evidence or by mean of the *McDonnell Douglas* burden-shifting framework." *Id.* (citing *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 n.4 (4th Cir. 2005)).

> i. Plaintiff alleges direct evidence of racial discrimination as it relates to her claims of unequal pay.

A plaintiff seeking to use direct or indirect evidence to establish discrimination must present evidence that "both display[s] a 'discriminatory attitude' and bear[s] a causal relationship with the adverse employment action." *Ousley v. McDonald*, 648 F.App'x 346, 349 (4th Cir. 2016) (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006)). "Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment

action." *Warch*, 435 F.3d at 520 (citing *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999)). When an employee is subjected to unequal pay, it "can, of course, constitute a materially adverse employment action." *Butler v. N.Y. Health & Racquet Club*, 768 F.Supp.2d 516, 532 (S.D.N.Y. 2011).

Defendants repeatedly assert that Plaintiff made more money than her predecessor while serving as Interim Executive Director. *See* ECF No. 22-1 at 1, 3, 5, 6, 7, 8, & 16; ECF No. 24 at 5, 6, & 7. Defendants allege that Mr. Guinane only received $72,000 per year (as opposed to $120,000) as Executive Director, while Plaintiff received almost $95,000 per year. Defendants' repetition and proffered calculations are intentionally misleading.

Plaintiff received $75,000 per year as a Field Coordinator under her term contract, which was effective from December 6, 2016, through December 5, 2018. While still operating under this contract, Plaintiff was also offered the role of Interim Executive Director. After much disagreement about what Plaintiff's salary would be when she eventually assumed the permanent Executive Director position, the Board approved a $1,666.00 per month stipend while Plaintiff served as Interim Executive Director. The $1,666.00 per month stipend was the only compensation Plaintiff received for the Interim Executive Director position, as she was already entitled to $75,000 per year for her Field Coordinator position—a role she continued to fill while serving as Interim Executive Director. ECF No. 20 at 10, ¶ 50 ("During her tenure as Interim Executive Director, [Plaintiff] acted and performed tasks as . . . Field Coordinator and Trainer . . . ."). In the light most favorable to the Plaintiff, even if the Court accepts Defendant's assertion that MPEC only paid Mr. Guinane $72,000 per year as Executive Director, Plaintiff was still paid over $50,000 per year less than Mr. Guinane for occupying the same role. Accordingly, Plaintiff has sufficiently

11

alleged that she was subject to an adverse employment action by receiving unequal pay compared to her predecessor.

Even when a plaintiff demonstrates that an adverse employment occurred, the employment action must be causally connected to a discriminatory attitude to serve as direct or indirect evidence of discrimination. Plaintiff is able to show this causal connection as it relates to her unequal pay. When Defendant Smith was justifying his proposal of a lower salary to Plaintiff after he originally offered her the Interim/permanent Executive Director position in April 2018, he did so by informing Plaintiff "[the hiring panel] wanted the white man." ECF No. 20 at 13, ¶ 67. Later, after the Board approved Plaintiff's monthly stipend as compensation for the Interim Executive Director position, Board member Jewel Freeman-Scott informed Plaintiff "I think they want to low-ball you because you are a black woman." *Id.* at 14, ¶ 73. This statement was echoed by Board member Ricky Carpenter when he told Plaintiff she was receiving a lower salary than Mr. Guinane because Plaintiff is "a black woman." *Id.* at 14, ¶ 74. Thus, Plaintiff has alleged both a discriminatory attitude and a causally connected adverse employment action to provide direct evidence of racial discrimination relating to her unequal salary.

    ii. Plaintiff alleges sufficient facts under the *McDonnell Douglas* framework to support her claim of discrimination as it relates to her termination.

Because Plaintiff was able to demonstrate direct evidence of discrimination as it relates to her unequal pay claim of discrimination, the Court need not engage in the *McDonnell Douglas* analysis regarding unequal pay. Plaintiff did not, however, provide direct or indirect evidence of discrimination as it relates to her termination, so the Court turns to the *McDonnell Douglas* framework to address Plaintiff's termination claim.

A claim of discrimination may be analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Holland v. Wash. Homes, Inc.*, 487

F.3d 208, 214 (4th Cir. 2007). Under that framework, a plaintiff can establish a *prima facie* case of discrimination by showing that: "(1) she is a member of a protected class; (2) she 'suffered an adverse employment action'; (3) her job performance was satisfactory; and (4) the adverse employment action occurred 'under circumstances giving rise to an inference of unlawful discrimination.'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F.App'x 745, 747 (4th Cir. 2017) (quoting *Adams v. Tr. of Univ .of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011)). Plaintiff can establish the fourth element by showing "similarly-situated employees outside the protected class received more favorable treatment," *id.* (quoting *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)), or "the position remained open or was filled by similarly qualified applicants outside the protected class," *Holland*, 487 F.3d at 214 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).

In *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002), the Supreme Court found at the motion to dismiss stage there is no indication "the requirements for establishing a *prima facie* case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511. After the Supreme Court established comprehensive pleading requirements in *Iqbal* and *Twombly*, the Fourth Circuit explained, "*Swierkiewicz* remain[s] binding precedent," but the plaintiff is "'required to allege facts to satisfy the elements of a cause of action.'" *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017) (quoting *McCleary-Evans v. Maryland Dep't of Transp.*, 780 F.3d 582, 585 (4th Cir. 2015)). Ultimately, to sustain a complaint at the motion to dismiss stage, a plaintiff "must allege a *plausible* claim for relief," and must not rely only on speculation. *McCleary-Evans*, 780 F.3d at 587 (emphasis in original).

Liability for discrimination "can arise from a tangible employment action," which includes "hiring, firing, failing to promote, . . . [and] reassignment with significantly different responsibilities." *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)) (internal quotation marks omitted). To survive a motion to dismiss, a plaintiff must allege facts sufficient to support a reasonable inference that because of her race, her employer took an adverse employment action against her. *Bowling v. Humanim, Inc.*, JKB-16-3298, 2017 WL 713862, at *2 (D.Md. Feb. 22, 2017) (citing *McCleary-Evans*, 780 F.3d 582, 585 (4th Cir. 2015)).

As an African-American woman, Plaintiff is unquestionably a member of a protected class. ECF No. 20 at 2, ¶ 4. Plaintiff was terminated, a qualifying adverse employment action. *Id.* at 28; ¶ 159. Plaintiff has also sufficiently alleged that her job performance as Interim Executive Director was satisfactory. *Id.* at 7, 18, 29 ¶¶ 34, 95, 166. Finally, after Plaintiff's termination, the Executive Director position was resumed by Mr. Guinane, a white male outside the protected class. *Id.* at 30, ¶ 168; *see also Holland*, 487 F.3d at 214. Plaintiff has also alleged sufficient facts to support a connection between her termination and Defendants' discrimination. During her tenure as Interim Executive Director, she was subjected to unequal pay, as established above. She also consistently protested her unequal pay as racially and gender discriminatory. ECF No. 20 at 12, 13–14, 15–17, 18, 22, 23, 24, ¶¶ 62, 64, 70, 78, 79–80, 83–84, 87, 92–95, 117, 126, 132. Because she protested her unequal pay over the entire ten months during which she served as Interim Executive Director, Plaintiff has alleged sufficient facts to support a plausible inference that her termination was the result of discrimination.

Plaintiff has alleged sufficient facts to support her claim of discrimination via unequal pay and disparate treatment under the direct evidence standard. Plaintiff has also alleged sufficient

facts to support her claim of discrimination via termination under the *McDonnell Douglas* framework. Accordingly, Defendants' Motion to Dismiss Plaintiff's claim of racial discrimination in Count I of her First Amended Complaint will be DENIED.

            b.  Plaintiff alleges sufficient facts to support her § 1981 claim of retaliation.

Like claims of discrimination, "[c]laims of retaliation under § 1981 and under Title VII are analyzed according to the same substantive requirements." *Bowling*, 2017 WL 713862, at *3 (citing *Jenkins v. Gaylord Entm't. Co.*, 840 F.Supp.2d 873, 880 (D.Md. 2012)). A *prima facie* case of discrimination requires that a plaintiff establish: "(1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that a causal connection exists between the protected activity and the adverse employment action." *Tasciyan v. Med. Numerics*, 820 F.Supp.2d 664, 675 (D.Md. 2011) (citing *Davis v. Dimensions Health Corp.*, 639 F.Supp.2d 610, 616–17 (D.Md. 2009)). "Opposing an 'unlawful employment practice' is a protected activity." *Bowling*, 2017 WL 713862, at *3 (quoting *Cepada v. Bd. of Educ. of Balt. Cty.*, 974 F.Supp.2d 772, 788 (D.Md. 2013)). "Opposition almost always arises when an employee communicates to her employer her reasonable belief that the employer has engaged in discrimination." *Tasciyan*, 820 F.Supp.2d at 675 (citing *Crawford v. Metro. Gov't of Nashville and Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009)). A plaintiff can satisfy the causation element either (1) by showing close temporal proximity between the protected activity and the adverse employment action or (2) by the court inferring events that might have occurred during the intervening period for other evidence of retaliatory animus. *Bowling*, 2017 WL 713862, at *3

(first citing *Clark Cty. Sch. Dist. V. Breeden*, 532 U.S. 268, 273 (2001), then citing *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007)).

      i.    Plaintiff alleges sufficient facts of retaliation as it relates to her unequal pay through the temporal proximity test.

Plaintiff first alleges that Defendants retaliated against her by repeatedly ratifying the decision to pay her less money as Executive Director than her predecessor. Plaintiff consistently opposed MPEC and other Defendants' decisions to pay her a lower salary as Executive Director than Mr. Guinane had received. *See* ECF No. 20 at 12, 13–14, 15–17, 18, 22, 23, 24, ¶¶ 62, 64, 70, 78, 79–80, 83–84, 87, 92–95, 117, 126, 132. During these protests, Plaintiff made clear to Defendants that their decisions were discriminatory based on her race and her gender. *See id.* Because she consistently opposed these decisions as discriminatory, Plaintiff was engaging in a protected activity, satisfying the first element of a *prima facie* case of retaliation. MPEC unquestionably took adverse employment action against Plaintiff by terminating her, satisfying the second element. Plaintiff can satisfy the causation element of a *prima facie* case by temporal proximity. Plaintiff first objected to her Executive Director salary as being less than Mr. Guinane's on April 2, 2018. ECF No. 20 at 12, ¶ 62. Three days later, on April 5, 2018, the MPEC Board approved a salary of $80,000 for Plaintiff as Executive Director, which she also rejected as being racially and gender discriminatory, as it was $40,000 less than Mr. Guinane's total salary. *Id.* at 13–14, ¶¶ 68–70. Each time Plaintiff tried to protest her salary—always claiming the Board's offers were discriminatory—the Board either refused to address it or offered her a salary much lower than Mr. Guinane's. Accordingly, Plaintiff has alleged sufficient facts to indicate that

Defendants' decisions to pay her an unequal salary were in retaliation to her engaging in a protected activity.

> ii. Plaintiff alleges sufficient facts of retaliation as it relates to her termination under the inference of retaliatory animus standard.

Plaintiff next alleges that Defendants retaliated against her by terminating her employment. As determined above, Plaintiff was engaging in the protected activity of protesting discriminatory compensation, and she suffered an adverse employment action when MPEC terminated her. The last time Plaintiff specifically alleged in her complaint she addressed the unequal pay and position title issues with the Board was November 9, 2018. ECF No. 20 at 18, 22, 24, ¶ 92–94, 117, 132. She was terminated on February 1, 2019. *Id.* at 28, ¶ 159. Although the Fourth Circuit has not determined a specific timeframe for establishing temporal proximity in a retaliation claim, the twelve-week gap between Plaintiff's last alleged protected activity and her ultimate termination is likely too long to satisfy the temporal proximity test. Plaintiff has, however, alleged enough facts for the Court to infer evidence of retaliatory animus regarding her termination. *See Bowling*, 2017 WL 713862, at *3.

In *Lettieri v. Equant Inc.*, 478 F.3d 640 (4th Cir. 2007), the Fourth Circuit found that "continuing retaliatory conduct and animus" directed at the plaintiff during the seven months between when the plaintiff filed a discrimination complaint with her human resources department and her termination still satisfied the causation element of her retaliation claim. *Id.* at 650. In that case, the plaintiff filed a discrimination complaint against two supervisors in December 2001. *Id.* After the supervisors were informed of the complaint, they stripped the plaintiff of significant job responsibilities by reducing her supervisory capacity and stripping her authority to meet with clients. *Id.* at 650–51. The supervisors also began discussing plans to terminate the plaintiff in February or March 2002, several months before her actual termination in June 2002. *Id.* at 651.

The Fourth Circuit found that these events between her discrimination complaint and her termination evinced sufficient retaliatory animus to support the plaintiff's retaliation claim. *Id.*

Like in *Lettieri v. Equant Inc.*, Plaintiff in this case has provided enough evidence of retaliatory animus to support her retaliation claim as it relates to her termination. Even though she does not specifically allege in her First Amended Complaint that she complained of Defendants' discriminatory behavior between November 9, 2018, and February 1, 2019, she does allege that she continued to press the Board regarding her experience with Defendants' unethical behavior as recently as January 13, 2019. ECF No. 28, ¶ 158. Furthermore, Defendant Smith threatened to fire Plaintiff twice and threatened to suspend her as recently as January 9, 2019. ECF No. 20 at 21, 24, 27, ¶¶ 110, 130, 151. Although her last explicit complaint of discrimination occurred on November 9, 2018, she had been consistently informing Defendants for months prior that their conduct towards her was racially and gender discriminatory. Based on the entire complaint and the circumstances Plaintiff alleges therein, the Court can properly infer that events occurred between November 9, 2018, and February 1, 2019, that provide further evidence of retaliatory evidence to support Plaintiff's retaliation claim as it relates to her termination. Accordingly, Plaintiff has alleged sufficient facts to indicate that Defendants' decision to terminate her were in retaliation to her engaging in a protected activity.

Plaintiff has alleged sufficient facts to support her retaliation claim as it relates to her unequal pay under the temporal proximity analysis. Plaintiff has also alleged sufficient facts to support her retaliation claim as it relates to her termination under the inference of retaliatory

animus standard. Accordingly, Defendants' Motion to Dismiss Plaintiff's claim of retaliation in Count II of her First Amended Complaint will be DENIED.

### 2. *Maryland Equal Pay Act Claims (Counts III and IV)*

In Counts III and IV, Plaintiff alleges that all Defendants engaged in gender discrimination and retaliation against her in violation of MEPA. Plaintiff alleges that Defendants discriminated against her by refusing to offer or to pay her a salary equal to her white, male predecessor based on her gender. Plaintiff then alleges that Defendants[6] retaliated against her for protesting their discriminatory actions by repeatedly offering her lower salaries than her predecessor, refusing to install her as MPEC's permanent director, and ultimately terminating her.

> a. Plaintiff alleges sufficient facts to support her claim that Defendants failed to pay her an equal wage in violation of the MEPA.

Under the MEPA,

> An employer may not discriminate between employees in any occupation by:
> (i) paying a wage to employees of one sex or gender identity at a rate less than the rate paid to employees of another sex or gender identity if both employees work in the same establishment and perform work of comparable character or work on the same operation, in the same business, or of the same type.

MD. CODE, LAB. & EMPL. §§ 3-304. When reviewing claims brought under the MEPA, "'[C]ourts have applied the same analysis in reviewing MEPA and [Equal Pay Act ("EPA")] claims,' because '[t]he MEPA essentially mirrors . . . the EPA.'" *Cohens v. Maryland Dep't of Human Res.*, 933 F.Supp.2d 735, 745 (D.Md. 2013) (quoting *Glunt v. GES Exposition Servs.*, 123 F.Supp.2d 847, 861–62 (D.Md. 2000)) (alterations in original). For a plaintiff to establish a *prima facie* case under the MEPA, she must prove (1) "her employer has paid different wages to employees of opposite

---

[6] Plaintiff concedes that Defendants Myers and Williams were not involved in the decision to terminate her. ECF No. 23 at 29. Accordingly, she dismisses Count IV as to Defendants Myers and Williams *only* to the extent that the claims relate to her termination. *Id.*

sexes," (2) "said employees hold jobs that require equal skill, effort, and responsibility," and (3) "such jobs are performed under similar working conditions." *Id.* at 747 (first quoting *Gunstin v. W. Va. Univ.*, 63 F.App'x 695, 698 (4th Cir. 2003), then quoting *Glunt*, 123 F.Supp.2d at 861–62).

Defendants do not dispute in their Motion to Dismiss that Plaintiff and her predecessor held jobs requiring equal skill, effort, and responsibility or that the jobs were performed under similar working conditions. Defendants only contend that Plaintiff's MEPA claim must fail because "she was paid more than the comparison employee." ECF 22-1 at 16. The Court has already determined that Plaintiff sufficiently alleged she was paid far less than her predecessor while serving as Interim Executive Director. *See supra* Part B.1.a.i. Plaintiff, therefore, has established a *prima facie* case under the MEPA. Accordingly, Defendant's Motion to Dismiss Plaintiff's claim of unequal pay in violation of the MEPA in Count III of her First Amended Complaint will be DENIED.

b.  Plaintiff alleges sufficient facts to support her claim of retaliation under the MEPA.

No court has addressed a claim of retaliation under the MEPA. Accordingly, the Court looks to cases filed pursuant to its federal analogy, the EPA, as guidance regarding Plaintiff's claim of retaliation under the MEPA. Claims of retaliation brought under the EPA are subject to the same analysis as claims of retaliation brought under Title VII and Section 1981. *See E.E.O.C. v. Nucletron Corp.*, 563 F.Supp.2d 592, 597 (D.Md. 2008) ("Title VII, the [Age Discrimination Employment Act], and the EPA each have nearly identical anti-retaliation provisions."). Accordingly, to establish a *prima facie* case of retaliation, a plaintiff must show that (1) "[s]he engaged in a protected activity," (2) "h[er] employer took adverse action against h[er]," and (3) "a

20

causal connection existed between the protected activity and the asserted adverse action." *Id.* at 600 (citing *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004)).

The analysis for retaliation under the MEPA or the EPA is the same as the analysis for retaliation under § 1981, which the Court has already discussed. Plaintiff's allegations of discrimination throughout her complaint are based on both race *and* gender. Therefore, for the reasons stated *supra*, Part B.1.b., Plaintiff has also alleged sufficient facts to support her claim of retaliation for unequal pay and termination under the MEPA. Accordingly, Defendant's Motion to Dismiss Plaintiff's claim of retaliation in Count IV of her First Amended Complaint will be DENIED.

### 3. *Wrongful Discharge Claim (Count V)*

In Count V, Plaintiff alleges Defendants MPEC, Smith, Buie-Branam, and Brown[7] engaged in two forms of public policy wrongful discharge: (1) for termination resulting from sexual discrimination in violation of section 20-601 of the Maryland State Government Code, and (2) for termination resulting from reporting improper union activity in violation of section 3-306 of the Maryland State Personnel and Pensions Code. ECF No. 20 at 38–44, ¶¶ 219–250.

Maryland follows the common law rule that an at-will employment contract can be terminated by either party at any time. *Adler v. Am. Standard Corp.*, 291 Md. 31, 35 (1981) (internal citations omitted). The Maryland Court of Appeals, however, has held that "Maryland does recognize a cause of action for abusive discharge by an employer of an at will employee when the motivation for the discharge contravenes some clear mandate of public policy." *Id.* at 47. To sustain a claim of public policy wrongful discharge, "the employee must be discharged, the basis

---

[7] Plaintiff concedes that Defendants Myers and Williams were not involved in the decision to terminate her. ECF No. 23 at 21 n.7, 29. Accordingly, she dismisses Count V as to Defendants Myers and Williams. *Id.*

for the employee's discharge must violate some clear mandate of public policy, and there must be a nexus between the employee's conduct and the employer's decision to fire the employee." *Wholey v. Sears Roebuck*, 370 Md. 38, 50–51 (2002). A plaintiff also must particularly allege the employer violated a specific statute to state a wrongful discharge cause of action. *Molesworth v. Brandon*, 341 Md. 621, 629 (1996). The tort of wrongful discharge is not available to employees alleging violations of statutes that already provide an independent cause of action under which the employee can obtain relief. *Bagwell v. Downtown P'ship of Balt., Inc.*, ELH-18-1786, 2018 WL 5885525, at *3 (D.Md. Nov. 8, 2018). Maryland courts have only upheld claims of wrongful discharge in very limited circumstances. *King v. Marriott Int'l, Inc.*, 160 Md.App. 689, 700–01 (2005).

> a. Plaintiff alleges sufficient facts to support her wrongful discharge claim as it relates to gender discrimination.

Plaintiff first alleges wrongful discharge for gender discrimination and retaliation in violation of section 20-601 of the Maryland State Government Code. Because MPEC has fewer than fifteen employees, however, it is not subject to the Discrimination in Employment subtitle of the Maryland State Government Code, and the statute does not provide Plaintiff with an independent cause of action for discrimination and retaliation. *See* Md. Code, State Gov't § 20-601(d)(1)(i)(2A). But in *Molesworth v. Brandon*, 341 Md. 621 (1996), the Maryland Court of Appeals found "Maryland's public policy against sex discrimination is ubiquitous," and Maryland law "provides a clear statement of public policy sufficient to support a common law cause of action for wrongful discharge against an employer" with fewer than fifteen employees. *Id.* at 632, 637.

Because the tort of wrongful discharge exists against an employer with fewer than fifteen employees, Plaintiff must satisfy the three elements to establish her cause of action. First, Plaintiff was discharged on February 1, 2019. ECF No. 20 at 28, ¶ 159. As for the second and third

22

elements, as discussed above, Plaintiff has alleged sufficient facts to establish that she was discharged at least partially on the basis of gender discrimination, and her persistent complaints about gender discrimination regarding her salary were causally connected to her discharge. *See supra*, Part B.1.b. Plaintiff, therefore, has alleged sufficient facts to meet all three elements of a wrongful discharge cause of action for gender discrimination in violation of public policy.

b. Plaintiff fails to allege sufficient facts to support her wrongful discharge claim as it relates to her reporting violations of fiduciary duties.

Plaintiff next alleges wrongful discharge for reporting employer's violations of section 3-306(b)(6) of the Maryland State Personnel and Pensions Code. Plaintiff alleges that MPEC was not fairly representing its union members in violation of section 3-306 and was breaching its fiduciary duties to it members. Because Plaintiff is not an MPEC union member, she alleges she does not have a claim for relief for reporting unfair practices under section 3-306.

In *Wholey v. Sears Roebuck*, 370 Md. 38 (2002) (plurality), the Maryland Court of Appeals held that "terminating employment on the grounds that the employee (as a victim or witness) gave testimony at an official proceeding or reported a suspected crime to the appropriate law enforcement or judicial officer is wrongful and contrary to public policy." *Id.* at 60 (emphasis omitted). In order to bring a wrongful discharge claim on these grounds, however, "the employee must report the suspected criminal activity to the appropriate law enforcement or judicial official, not merely investigate suspected wrong-doing and discuss that investigation with co-employees or supervisors." *Id.* at 62. In *Wholey*, the petitioner only reported the suspected wrongdoing (in that case, theft) internally to his manager, not to the police or other external authority. *Id.* at 44–45. Because the petitioner did not externally report the theft, he was not able to obtain relief under the wrongful discharge claim the Court of Appeals recognized. *Id* at 68. In *King v. Marriott International, Inc.*, 160 Md.App. 689 (2005), the plaintiff was terminated for refusing to transfer

corporate funds in a way that she thought was an illegal use of corporate assets that would harm the benefit plan participants. *Id.* at 695–96. The Maryland Court of Special Appeals, basing its decision on *Wholey*, held "[w]hile we recognize that there is a general policy in Maryland that a fiduciary must serve the interests of the beneficiaries, we do not find any policy that protects a fiduciary who makes an internal complaint of corporate wrongdoing to co-workers and supervisors." *Id.* at 707. Because the plaintiff in that case only reported that she suspected wrongdoing to her supervisors instead of making an external report, she could not sustain a wrongful discharge claim. *Id.* at 708.

In this case, Plaintiff faces a similar roadblock to the plaintiffs in *Wholey* and *King*. Plaintiff was vocally opposed to the drastically different terms of Ms. Hawkin's "autonomous employee" contract, which Plaintiff felt were improperly drafted with a conflict of interest and were financially damaging to MPEC and its members. *See* ECF No. 20 at 22, 24–27 ¶¶ 114–116, 133–150. While Plaintiff alleges that Defendants MPEC, Smith, and Buie-Branam violated a variety of fiduciary duties to MPEC's union members, *see generally id.* at 42–43, ¶¶ 236–47, she never alleges that she made an external report to any outside source of authority regarding the alleged violations. Because Plaintiff only reported her suspicions of wrongdoing internally, the public policy wrongful discharge tort is not available to her on these grounds, and the Court need not further analyze this claim.

Plaintiff has alleged sufficient facts to sustain her wrongful discharge claim as it relates to her termination for gender discrimination. Plaintiff has not, however, alleged sufficient facts to sustain her wrongful discharge claim as it relates to her termination for reporting fiduciary duty violations. Accordingly, Defendants' Motion to Dismiss Plaintiff's wrongful discharge claim for gender discrimination in Count V of her First Amended Complaint will be DENIED, but the

Motion to Dismiss Plaintiff's wrongful discharge claim for reporting fiduciary duty violations in Count V of her First Amended Complaint will be GRANTED.

<h2 style="text-align:center">CONCLUSION</h2>

In conclusion, for the reasons stated herein, Defendants' Motion to Dismiss is GRANTED as to wrongful discharge for reporting fiduciary duty violations in Count V and DENIED as to Counts I, II, III, IV, and wrongful discharge for gender discrimination in Count V. A separate order will follow.

Date: 18 September 2014

A. David Copperthite
United States Magistrate Judge